SHAWMUT ENGINEERING CO. v. CROMPTON & KNOWLES LOOM WORKS.

(Circuit Court of Appeals, First Circuit. January 7, 1927.)

No. 2012.

1. Patents ⬚328—1,329,303 for frame for weaving Axminster carpets, held void.

The Lea patent, No. 1,329,303 for tube frame for weaving Axminster carpets, *held* void for lack of invention.

2. Patents ⬚328—1,469,185, claims 3 and 4, for improvement in weaving frames, held not infringed.

The Hathaway patent, No. 1,469,185, for improvement in suspension means for weaving frames, claims 3 and 4, *held* not infringed.

Appeal from the District Court of the United States for the District of Massachusetts; James Arnold Lowell, Judge.

Suit in equity by the Shawmut Engineering Company against the Crompton & Knowles Loom Works. Decree for defendant, and complainant appeals. Affirmed.

George N. Goddard, of Boston, Mass., for appellant.

Louis W. Southgate, of Worcester, Mass. (Charles T. Hawley, of Worcester, Mass., on the brief), for appellee.

Before BINGHAM, JOHNSON, and ANDERSON, Circuit Judges.

BINGHAM, Circuit Judge. This is a bill in equity for infringement of United States letters patent No. 1,329,303, to Charles Lea, applied for December 9, 1913, and issued January 27, 1920, for an improvement in tube frames used in weaving Axminster carpets, and No. 1,469,185, to E. F. Hathaway, applied for May 24, 1922, and issued September 25, 1923, for an improvement in suspension means for tube frames. Both patents are

owned by the plaintiff. Claims 13 and 14 of the first and claims 3 and 4 of the second patent are in issue. The claims read as follows:

"13. A supporting frame for a tuft spool and its co-operating tuft tubes, embracing a longitudinal tubular bar, spool-supporting brackets rigidly secured thereto, said spool-supporting brackets each being provided with a pair of offset retaining lugs projecting side by side from the arm and spaced apart to fit inside the open end of the tubular bar, and means for securing said lugs firmly to the bar when so inserted, substantially as described.

"14. A supporting frame for a tuft spool and its tuft tubes, comprising a longitudinal hollow bar, and a pair of angularly disposed spool-supporting arms provided with laterally projecting holding members adapted to fit inside the ends of the tubular bar, and retaining screws passed transversely through the end portions of the bar into holding engagement with said supporting members, substantially as described."

"3. In a tube frame for weaving, the combination with a longitudinal carrier bar, of a spool supporting suspension hanger comprising a bracket rigidly secured to the end of the carrier bar to project vertically therefrom, and a coacting chain-engaging hook arm mounted on said bracket to swing outwardly therefrom under spring tension to releasably engage a carrier chain, said bracket being provided with a recess arranged to receive the opposed upwardly extending portion of the hook arm when the latter is pressed inwardly by the transfer mechanism to release the hook-arm from engagement with said chain, substantially as described.

"4. In a tube frame for weaving, the combination of a vertical hanger rigidly secured to the end of the carrier bar, a co-operating chain-engaging hook arm mounted to lie outside of the vertical hanger when engaged with the chain and to be pressed inwardly, to lie partly in a longitudinal recess in the hanger when disengaged from the chain by transfer mechanism, substantially as described."

[1] As to the first patent the defendant concedes infringement, if the plaintiff's patent is valid, but among its defenses asserts that it is invalid for the reasons (1) that it is not new, being anticipated; (2) that it does not involve invention; and (3) that it is invalid, because the device of the patent was in public use or on sale more than two years prior to the filing of the application for the patent.

The defenses to the second patent are, among others, noninfringement, noninvention, and invalidity, due to the alleged invention having been in public use or on sale more than two years prior to the filing of the application for the patent.

An Axminster carpet, in the weaving of which tube frames are used, comprises longitudinal warp threads, transverse weft threads, and short yarn tufts held between the interwoven warp and weft threads. The tube frame, to which these patents relate, is a device for inserting successive rolls of yarn tufts between the warp threads to form the pile of the carpet. It consists chiefly of a carrier bar, somewhat longer than the width of the carpet being woven, on which is secured a roll of parallel tubular guides or hollow fingers, one for each yarn tuft, which project an inch or more beyond the carrier bar, the projecting ends of which are narrowed to allow them to pass between the spaced warp threads in the loom to insert the ends of the yarn tufts which they contain. The yarn tufts having been so inserted, one or two weft threads are shot across behind the tufts, which (after being beaten up against the fell) hold the yarn tufts in place and permit them to be severed by knives. The tube frame is then returned to the chains, when the process is repeated with another tube frame. The tube frames are supplied with yarn wound on long spools mounted lengthwise on the carrier bar.

In weaving a carpet of one color without pattern, a single tube frame can be used until its yarn supply is exhausted. But pattern effects require the use of successive spools bearing yarns of different colors. To permit this provision is made for bringing the tube frames bearing the different colored spools of yarn to a position where they may be taken one after another and carried into the loom, to insert a roll of yarn tufts in the fabric being woven. As a great number of tube frames may be required, they are suspended, in proper sequence, from a pair of parallel chains, which are moved step by step to transfer position, where they are gripped by transfer clutches, which release the hook latches of a given frame from the chains, carry the frame to a position to deliver its roll of tufts, and, after severance, return the frame to the chains. This operation is then repeated with another frame, and so on.

In the winter of 1909–10 Mr. Lea produced the device embodied in the first patent in suit. The problem was to provide a construction whereby the brackets would be securely attached to the ends of the carrier bar, so as not to work loose under the strains to which they are subjected in service. To accomplish this he devised brackets, the vertical arms of which at the attaching ends were provided with lateral lugs to be inserted in the ends of

a tubular metallic carrier bar, and held in position by machine screws passing through holes in the walls of the bar and the lugs of the brackets.

In the District Court the bill was dismissed on the ground that neither patent involved invention.

We agree with the District Court that the device of the first patent does not involve invention. We think the means disclosed in the patent for attaching the ends of the brackets to the ends of the carrier bar were only such as a mechanic skilled in the art would use, and involved no conception worthy of being dignified as invention; that, the carrier bar used being a tubular one, the obvious way of attaching the brackets to it was to provide the lower ends of the brackets with a lug, or lugs, that would fit the hole of the tubular bar and, having the lugs so shaped, to insert them into the ends of the bar and hold them there by a screw or bolt. It involved nothing more than telescoping one piece of iron into another and securing it there by bolt or screw.

[2] As to the second patent, the specification states that "since it is necessary that the individual tuft tubes shall pass between the appropriate warp threads when delivering their tuft ends, it is important that there should be no bending, breakage or displacement of the parts in order that the tube may be accurately gaged for proper positioning."

After describing the tongue of the bracket which passes through the link of the chain to hold the tube frame in position on the chain and referring to the suspension hook co-operating therewith for suspending the tube frame on the chain, the patentee says: "Instead of the usual flexible spring hook arm commonly employed in the art, I provide a vertical hook arm 20 of sufficient rigidity or stiffness to resist bending or distortion under service strains, and to secure the desired outward and inward movement the hook is fulcrumed at its lower end on a fulcral pin or axis 12 to allow it to have a pivotal or swinging movement outward, a coil spring 25 being suitably mounted to yieldingly press the upper end of the hook arm 20, which is formed in the shape of a hook 20a outwardly into interlocking engagement with the carrier chain c."

After speaking of the transfer clutches commonly employed to engage the tube frame for the purpose of disconnecting it from the chains and presenting the tuft-carrying tubes to the fabric in the loom he says: "It will be understood that these transfer clutches or devices are of the usual construction, having bottom, lateral, and top wings forming at the opposite ends of the tube frames two carrier cradles having an inward movement to disengage the hook from the chain by contact and pressure and a downward movement for presenting the tube frame to the loom. As it is important that there should be no longitudinal displacement of the tube frame in order that the appropriate tuft-delivering tubes may pass between the appropriate warp threads and the fabric, I make provision for so arranging the hook arm that when it is pressed inward by the advancing transfer mechanism the outer face of its lower portion will lie flush with the outer face of the rigid or fixed hanger element 21 so that the transfer mechanism gages against the firm immovable hanger element 21, to position the tube frame preparatory to presenting it to the fabric instead of gaging against the yielding and movable hook. This flush relationship between the two elements of the suspension means is accomplished in this case by locating the fulcral axis of the hook inside of the outer face of the fixed hanger and providing the hanger with an interior depression or recess which allows the adjacent vertical portion of the hook arm to swing thereinto so that when the transfer device b [clutch] reaches the end of its inward movement it will gage against the firm immovable hanger element, thereby securing exact longitudinal position of the tube frame."

From this description of the device it appears that the hook arm is a rigid arm, not the flexible spring hook arm commonly employed; that it "is fulcrumed at its lower end on a fulcral pin or axis 12"; that the "fulcral axis of the hook" is located "inside of the outer face of the fixed hanger" that has "an interior depression or recess which allows the adjacent vertical portion of the hook to swing thereinto"; and that the portion of the hook arm which "will lie flush with the outer face of the rigid or fixed hanger element 21 * * * when it is pressed inward by the advancing transfer mechanism" is the "outer face of its lower portion."

The elements of claim 3 of the patent comprise (1) a bracket; (2) a hook arm mounted on the bracket to swing outwardly; (3) a recess in the bracket arranged to receive the opposed upwardly extended portion of the hook arm.

The elements of claim 4 comprise (1) a vertical hanger or bracket, and (2) a hook arm mounted, when engaged with the chain, to lie outside the vertical hanger or bracket, and, when not so engaged, to lie partly in a longitudinal recess in the hanger.

Exhibit 4, the alleged infringing device, does not have a rigid stiff hook arm, but a flexible spring hook arm such as is common-

ly employed in the art. It is not "fulcrumed at its lower end on a fulcral pin or axis" to allow it to have a pivotal or swinging motion outward and inward. It has no "fulcral axis" located inside a recess in the fixed hanger, and no recess in that region of the fixed hanger where the fulcral axis of the hook arm could be located, if it had a fulcral axis. The flexible spring hook of the alleged infringing device at its lower end, where the plaintiff's device has a fulcral axis, is immovably secured to the outer face of the fixed hanger by two screws, and "the outer face" of the "lower portion" of the hook will not "lie flush with the outer face of the rigid or fixed hanger." This device does not infringe claim 3 or claim 4. The patent is a narrow one. The claims are not entitled to a broad construction. The improvement, if it is an improvement, is of a minor nature in a refined art, and necessarily pretty closely restricted to the means disclosed. The depression or recess in the fixed hanger of the plaintiff's patent is provided, according to the specification, so that the outer face of the "lower portion" of the hook arm will lie flush with the outer face of the fixed hanger. But the plaintiff would have us construe these claims to mean that the portion of the hook arm which lies "flush with the outer face of the * * * fixed hanger" (claim 3) or "partly in a longitudinal recess in the hanger" (claim 4) is not the lower portion of the hook arm, but the upper portion in the vicinity of the hole through which it passes in the extension arm or tongue that engages the chain—a complete reversal of the position taken by the patentee in his specification and upon which the claims are predicated. To give the claims such a construction would result in holding them invalid, for the evidence shows that it was a common thing to recess, cut away, or offset the upper portion of the fixed hanger, all equivalent means.

The decree of the District Court, dismissing the plaintiff's bill, is affirmed, with costs to the appellee.